SHEPPARD MULLIN RICHTER & HAMPTON LLP
P. CRAIG CARDON, Cal Bar No. 168646
JAY T. RAMSEY, Cal Bar No. 273160
BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
ALYSSA SONES, Cal Bar No. 318359
PATRICK RUBALCAVA, Cal Bar No. 335940
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:    310.228.3700
Facsimile:    310.228.3701
Email:        ccardon@sheppardmullin.com
              jramsey@sheppardmullin.com
              baigboboh@sheppardmullin.com
              asones@sheppardmullin.com
              prubalcava@sheppardmullin.com

*Attorneys for Defendant*
WILLIAMS-SONOMA, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KAREN SPECTOR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAMS-SONOMA, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION**<br><br>**DEFENDANT WILLIAMS-SONOMA, INC.'S NOTICE OF REMOVAL**<br><br>[Superior Court of California, County of San Francisco, Case No. CGC-24-617422]<br><br>Complaint Filed: August 21, 2024<br>Trial Date:        None Set |

-1-

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:**

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453, Defendant Williams-Sonoma, Inc. ("Defendant") hereby removes the above-captioned action—*Karen Spector v. Williams-Sonoma, Inc.*, Case No. CGC-24-617422 (the "State Court Action")—from the Superior Court of California for the County of San Francisco to the United States District Court for the Northern District of California.

## I.    BACKGROUND

1.    On August 21, 2024, Plaintiff Karen Spector ("Plaintiff") filed a *Class Action Complaint* ("*Complaint*") against Defendant in the State Court Action.  Ex. A (*Complaint*).[1]

2.    The *Complaint* asserts a claim for violation of Arizona's Telephone, Utility and Communication Service Records Act, A.R.S. § 44-1376 *et seq.* ("Arizona Records Act"), on behalf of Plaintiff and a putative class of other similarly-situated individuals located in Arizona arising from Defendant's alleged use of tracking pixels in its marketing emails.  Ex. A (*Complaint*) ¶¶ 1, 41.

## II.    REMOVAL IS PROPER

3.    Under the Class Action Fairness Act ("CAFA"), federal courts have jurisdiction over putative class actions if:  (a) any member of the plaintiff class is a citizen of a State different from any defendant (28 U.S.C. § 1332(d)(2)(A)); (b) the primary defendants are not states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief (*id.* § 1332(d)(5)(A)); (c) there are more than 100 members in the putative class(es) (*i.e.*, there is "minimal diversity") (*id.* § 1332(d)(5)(B)); and (d) the amount in controversy exceeds $5,000,000, exclusive of interests and costs (*id.* § 1332(d)(6)).

4.    The State Court Action is removable under CAFA because putative class members are citizens of a State different from that of Defendant (which is not a state, state official, or other

---

[1]  Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served on Defendant in the State Court Action are attached hereto as **Exhibit A**.

NOTICE OF REMOVAL

government entity), there are more than 100 putative class members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

**A.     Minimal Diversity Exists**

5.     Minimal diversity exists where any member of the putative class is a citizen of a State different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

6.     The *Complaint* alleges Plaintiff is an Arizona citizen. Ex. A (*Complaint*) ¶ 7.

7.     Defendant is a Delaware corporation headquartered in California. Ex. A (*Complaint*) ¶ 10. As such, Defendant is a citizen of Delaware and California. *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (corporations are citizens of "(1) the state where its principal place of business is located, and (2) the state in which it is incorporated") (citing 28 U.S.C. § 1332(c)(1)).

8.     The *Complaint* asserts that Plaintiffs seeks to represent a putative class of "[a]ll persons within Arizona who have opened a marketing email containing a tracking pixel from Defendant." Ex. A (*Complaint*) ¶ 46. Many of those individuals are likely citizens of Arizona, including, at minimum, Plaintiff.

9.     Because members of the putative class are citizens of a state different from Defendant, minimal diversity exists. 28 U.S.C. § 1332(d)(2)(A).

**B.     Defendant Is Not A State, State Official, Or Government Entity**

10.     Defendant is not a state, state official, or government entity. As such, CAFA's non-governmental entity requirement is satisfied. 28 U.S.C. § 1332(d)(5)(A).

**C.     The Putative Class Exceeds 100 Class Members**

11.     Plaintiff alleges that "[o]n information and belief, members of the Class number in the hundreds of thousands." Ex. A (*Complaint*) ¶ 48. The putative class thus exceeds 100 members.

**D.     The Amount In Controversy Exceeds $5,000,000**

12.     Under CAFA, removal is proper where "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2). "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28

U.S.C. § 1332(d)(6).  Although the *Complaint* does not include a specific total monetary demand—and Defendant denies that it has any liability, or owes any damages, to Plaintiff or any putative class—the amount in controversy requirement is met.

13.     The *Complaint* seeks, at minimum, $1,000.00 per alleged violation of the Arizona Records Act.  Ex. A (*Complaint*) ¶ 64; *see also id.* at Prayer for Relief.

14.     The *Complaint* alleges that the putative class includes "hundreds of thousands" of individuals.  Ex. A (*Complaint*) ¶ 48.  As such, the minimum amount in controversy is $100 million ($1,000 x 100,000).

15.     Therefore, CAFA's amount in controversy requirement is satisfied.  28 U.S.C. §§ 1332(d)(2), (d)(6).

**III.     THE *NOTICE OF REMOVAL* IS PROCEDURALLY PROPER**

16.     This *Notice of Removal* contains a "short plain statement of the grounds for removal" and includes copies of the *Complaint* and other any process, pleadings, and orders Plaintiff served on Defendant.  28 U.S.C. § 1446(a).

17.     This *Notice of Removal* is timely filed under 28 U.S.C. §§ 1446(b) and 1453(b).  Plaintiff served the *Complaint* on Defendant on August 23, 2024.  Defendant's deadline to remove, therefore, is Monday, September 23, 2024.  28 U.S.C. §§ 1446(b), 1453(b).

18.     Venue is proper in the United States District Court for the Northern District of California because the State Court Action was filed and is pending in the Superior Court of California for the County of San Francisco, which is within the Northern District of California.  28 U.S.C. §§ 1441(a), 1446(a).

19.     Defendant will promptly file the *Notice to Superior Court and Adverse Party of Removal to Federal Court* attached hereto as **Exhibit B** with the State Court and provide a copy of the same to Plaintiff.  28 U.S.C. § 1446(d).

20.     By removing the State Court Action to this Court, Defendant does not waive any defenses that are available to it under state or federal law.  Defendant expressly reserves all threshold defenses to this action and its right, for example, to move to compel arbitration, to dismiss or for the

NOTICE OF REMOVAL

entry of judgment pursuant to Federal Rules of Civil Procedure 12 and 56, and/or to strike or oppose the certification of any putative class pursuant to Federal Rule of Civil Procedure 23.

### IV.    <u>CONCLUSION</u>

21.    WHEREFORE, pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453 and for the reasons set forth above, Defendant respectfully removes this action from the Superior Court of California, San Francisco County, to the United States District Court for the Northern District of California.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated:  September 20, 2024        By        _/s/ P. Craig Cardon_
P. CRAIG CARDON
JAY T. RAMSEY
BENJAMIN O. AIGBOBOH
ALYSSA SONES
PATRICK RUBALCAVA

_Attorneys for Defendant_
WILLIAMS-SONOMA, INC.

SMRH:4863-5532-5927.2

NOTICE OF REMOVAL

EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
WILLIAMS-SONOMA, INC.,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KAREN SPECTOR, individually and on behalf of all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Superior Court of California <br><br> County of San Francisco, 400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER: <br> *(Número del Caso):* <br><br> **CGC-24-617422** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
L. Timothy Fisher, Bursor & Fisher, 1990 N. California Blvd., 9th Floor, Walnut Creek, CA 94596, Tel.: (925) 300-4455

DATE:
*(Fecha)* **08/22/2024**

Clerk, by
*(Secretario)* **SHENEQUA GLADNEY** , Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Williams-Sonoma, Inc.
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

[ Print this form ]  [ Save this form ]          [ Clear this form ]

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>L. Timothy Fisher (State Bar No. 191626)<br>Bursor & Fisher, P.A., 1990 N. California Blvd., 9th Floor, Walnut Creek, CA 94596 | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: (925) 300-4455    FAX NO.: (925) 407-2700<br>EMAIL ADDRESS: ltfisher@bursor.com<br>ATTORNEY FOR (Name): Plaintiff Karen Spector | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**08/21/2024**<br>**Clerk of the Court**<br>BY: SHENEQUA GLADNEY<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

| CASE NAME:<br>Karen Spector v. Williams-Sonoma, Inc. | |
|---|---|

| CIVIL CASE COVER SHEET<br>[x] Unlimited      [ ] Limited<br>(Amount          (Amount<br>demanded        demanded is<br>exceeds $35,000)  $35,000 or less) | Complex Case Designation<br>[ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: **CGC-24-617422** |
|---|---|---|
| | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | [ ] Enforcement of judgment (20) |
| [x] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] Other complaint (not specified above) (42) |
| [ ] Fraud (16) | [ ] Residential (32) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Other petition (not specified above) (43) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2.  This case [x] is    [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
    a. [ ] Large number of separately represented parties      d. [x] Large number of witnesses
    b. [x] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more issues that will be time-consuming to resolve          courts in other counties, states, or countries, or in a federal court
    c. [x] Substantial amount of documentary evidence        f. [ ] Substantial postjudgment judicial supervision

3.  Remedies sought (check all that apply): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4.  Number of causes of action (specify): One
5.  This case [x] is    [ ] is not   a class action suit.
6.  If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)
Date: August 21, 2024
L. Timothy Fisher
_____
(TYPE OR PRINT NAME)                                 (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

CM-010 [Rev. January 1, 2024]     **CIVIL CASE COVER SHEET**     Page 2 of 2

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form | | Clear this form |

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**08/21/2024**
**Clerk of the Court**
BY: SHENEQUA GLADNEY
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

**CGC-24-617422**

KAREN SPECTOR, individually and on behalf of all others similarly situated,

                              Plaintiff,

          v.

WILLIAMS-SONOMA, INC.,

                              Defendant.

Case No.

**CLASS ACTION COMPLAINT**

1. **Violation of the Arizona Telephone, Utility and Communication Service Records Act, A.R.S. § 44-1376** *et seq.*

**Jury Trial Demanded**

---

Plaintiff Karen Spector, individually and on behalf of all others similarly situated, as set forth herein, alleges as follows:

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons in the State of Arizona that opened emails sent to them by Williams-Sonoma, Inc. ("Defendant" or "Williams-Sonoma") due to Defendant's violations of Arizona's Telephone, Utility and Communication Service Records Act, A.R.S. § 44-1376 *et seq.*

2.      Defendant is "one of the United States' largest e-commerce retailers"[1] of cookware, appliances, and home furnishings.  To entice consumers to purchase their products and maximize sales, Defendant disseminates marketing emails and uses spy pixels to track its recipients' reading habits.  Defendant exploits this data to build customer profiles so it can sell and market more products to them.  Its recipients may be aware that they receive marketing emails, but they are not aware of, nor do they consent to, Defendant's surreptitious means of tracking their sensitive reading behavior.

3.      Plaintiff and Class members receive marketing emails from Defendant.

4.      Defendant embeds hidden spy pixel trackers within its emails.  These trackers capture and log sensitive information including the time and place subscribers open and read their messages, how long it takes the subscriber to read the email, subscribers' location, subscribers' email client type, subscribers' IP address, subscribers' device information and whether and to whom the email was forwarded to.  Defendant never received subscribers' consent to collect this private information.

5.      Defendant's invasive surveillance of Plaintiff's sensitive reading habits and clandestine collection of her confidential email records invaded her privacy and intruded upon her seclusion.

6.      By failing to receive consent from Plaintiff and Class members, Defendant is violating Arizona's Telephone, Utility and Communication Service Records Act, a statute that

---

[1] https://www.williams-sonomainc.com/company-overview/

1  prohibits procuring or attempting to procure the communication service records of email recipients

2  without their authorization.

3                                          **PARTIES**

4       7.      Plaintiff is a resident of Arizona, residing in Scottsdale, Arizona. Within the past

5  two years, Plaintiff has received promotional emails from Defendant. Plaintiff has frequently

6  opened emails from Defendant to review promotional materials. Plaintiff most recently opened

7  one of Defendant's emails within the last six months.

8       8.      Each time Plaintiff opened an email from Defendant, Defendant procured her

9  sensitive email information including the time and place she opened and read the messages, how

10 long she read the email, her location, her email client type, her IP address, her device information

11 and whether and to whom the email was forwarded to.

12      9.      , Defendant never received consent from Plaintiff to procure her private email

13 records.

14      10.     Defendant Williams-Sonoma, Inc. is a Delaware corporation with its principal place

15 of business in San Francisco, California. Defendant markets and sells its products throughout

16 Arizona and the entire United States under the following brands: Williams-Sonoma, Williams-

17 Sonoma Home, Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, West Elm, Mark & Graham,

18 Rejuvenation, and GreenRow.

19                              **JURISDICTION AND VENUE**

20      11.     This Court has subject matter jurisdiction over all causes of action alleged in the

21 Complaint pursuant to the California Constitution, Article VI, §10, and is a Court of competent

22 jurisdiction to grant the relief requested. Plaintiff's claims alleged in this Complaint are not

23 preempted by federal law, do not challenge conduct within any federal agency's exclusive domain,

24 and are not statutorily assigned to any other trial court.

25      12.     This Court has personal jurisdiction over Williams-Sonoma, Inc. because Defendant

26 is headquartered in this County and Plaintiff's claims arise from that business. The connection

27 between Plaintiff's claims and Defendant's California business operations renders the exercise of

28

1  jurisdiction by this Court over Defendant appropriate under traditional notions of fair play and

2  substantial justice.

3        13.      Venue is proper in this Court pursuant to Code of Civil Procedure §§395 and 395.5.

4  Defendant resides in the City and County of San Francisco, Defendant regularly conducts business

5  in the City and County of San Francisco, and a substantial portion of the events giving rise to the

6  claims alleged herein occurred in the City and County of San Francisco.

7  **FACTUAL ALLEGATIONS**

8      **A.**      **The HP Spying Scandal and A.R.S. § 44-1376**

9        14.      In 2001, Hewlett-Packard "embark[ed] on one of the largest and most difficult

10  mergers in American business history."[2] Spearheaded by then-CEO Carly Fiorina, HP sought to

11  acquire a rival company, Compaq, Inc., in a deal valued at $25 billion.[3]

12        15.      "Widely considered one of the worst tech mergers in history,"[4] the economic fallout

13  from the acquisition began immediately.[5] By 2004, "Hewlett-Packard's stock had dropped below

14  seventeen dollars, from a high of more than sixty dollars, in 2000."[6] Industry insiders took note,

15  with a "consensus" believing that "the new HP, the tech industry's most sprawling conglomerate,

16  ha[d] lost its focus and [was] being squeezed between two formidable rivals with much clearer

17  business models, Dell and IBM."[7]

18

19

20  [2] Michael Malone, *The H-P-Compaq Mess Isn't All Carly's Doing*, WALL. ST. J. (May 21, 2002), https://www.wsj.com/articles/SB1021933260918245440.

21  [3] Andrew Ross Sorkin, *Hewlett-Packard in Deal to Buy Compaq for $25 Billion in Stock*, N.Y.
22  TIMES (Sept. 4, 2001), https://www.nytimes.com/2001/09/04/business/hewlett-packard-in-deal-to-buy-compaq-for-25-billion-in-stock.html.

23  [4] PCMag Staff, *The Biggest Tech Mergers and Acquisitions of All Time*, PCMAG (Apr. 12, 2021), https://www.pcmag.com/news/the-biggest-tech-mergers-and-acquisitions-of-all-time.

24  [5] Mike Musgrove, *HP Posts $2 Billion Loss in First Full Quarter with Compaq*, WASH. POST (Aug.
25  28, 2002), https://www.washingtonpost.com/archive/business/2002/08/28/hp-posts-2-billion-loss-in-first-full-quarter-with-compaq/2486859a-b55c-4247-9f0a-cb1d839b68d8/.

26  [6] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007), https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

27  [7] The Economist Staff, *Losing the HP way*, THE ECONOMIST (Aug. 19, 2004), https://www.economist.com/business/2004/08/19/losing-the-hp-way.
28

16.     In January 2005, a few days before HP's annual retreat, two board members, Patricia Dunn and George Keyworth, met with Fiorina to discuss their concerns about the company's direction.[8]  Fiorina sought to placate Dunn and Keyworth, "agree[ing] to tear up her agenda for the board's strategy retreat … and focus instead on the directors' concerns."[9]  But shortly after the retreat, "a reporter for the *Wall Street Journal*, Pui-Wing Tam, called to confirm details that Tam had learned about the retreat, including assertions that Fiorina had lost the confidence of the board and that operating responsibilities would soon be shifted away from her."[10] "Clearly, someone at the retreat, which was attended only by board members and top executives, had leaked proprietary information."[11]

17.     Fiorina responded with fury.  After "call[ing] the board members together on the phone," Fiorina "dressed them down for giving details of the meeting."[12]  But that response only further inflamed tensions between Fiorina and the board, and less than two weeks after the retreat, the board met again, this time without Fiorina, and voted to dismiss her.[13]

18.     Despite Fiorina's departure, board members remained perturbed by the disclosures to the press, and so when elevating Patricia Dunn to nonexecutive chairwoman and tasking her with choosing Fiorina's successor, the board also provided Dunn with another mandate: "stop the board leaks."[14]

---

[8] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007), https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

[9] Alan Murray, H-P Board Clash Over Leaks Triggers Angry Resignation, WALL ST. J. (Sept. 6, 2006), https://www.wsj.com/articles/SB115749453036454340.

[10] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007), https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

[11] *Id.*

[12] Alan Murray, H-P Board Clash Over Leaks Triggers Angry Resignation, WALL ST. J. (Sept. 6, 2006), https://www.wsj.com/articles/SB115749453036454340.

[13] *Id.*

[14] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007), https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

19.     Dunn promptly initiated an investigation, code-naming it "Project Kona."[15]  But before Project Kona could get off the ground, another more damaging leak came to light.[16]  In the months after Fiorina's removal, Dunn selected Mike Hurd, a CEO at a competitor company, to serve as HP's new CEO.[17]

20.     However, before the board could make an announcement, a reporter from *Business Week* reached out, asking for comment on Hurd's selection.[18]  Because Hurd had not yet left the other company, revealing his candidacy before he resigned could potentially derail the process.[19]

21.     Although Hurd would go on to become HP's CEO without issue, the new disclosure added urgency to determining who was behind the leaks.[20]  For Dunn, Project Kona was the way to find out.[21]

22.     To staff Project Kona, Dunn turned to a security manager at HP, Kevin Huska, who, in turn, "referred Dunn to an outside investigator named Ronald R. DeLia, whose firm, Security Outsourcing Solutions, based in Boston, had been under contract to Hewlett-Packard for some ten years."[22]  Throughout the summer of 2005, Dunn received regular updates from DeLia, including one call where he "revealed that his investigators had obtained private phone records of reporters."[23]

23.     DeLia received these records through "pretexting," which, in his own words, "involved investigators requesting information from [telephone] operators orally, over the phone,

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

1    pretending to be someone else if necessary."[24] Notwithstanding this invasion of privacy, Project

2    Kona failed to pinpoint a leaker, and as the year winded down, so too did the investigation.[25]

3         24.    Then, in January 2006, a reporter from CNET named Dawn Kawamoto published

4    an "inside account of the company's retreat, held two weeks earlier."[26] The substance of the article

5    was innocuous, but at HP, "the story was met with alarm."[27] In response to the leak, "[a] new

6    investigation was immediately launched, which Dunn called Kona II."[28] HP's general counsel,

7    Ann Baskins, "asked an employment lawyer at the company, Kevin Hunsaker, to head the renewed

8    investigation."[29] "With Hunsaker in day-to-day charge, the investigators undertook their mission

9    with extraordinary zeal," pretexting phone companies to obtain records for reporters, directors, and

10   employees.[30]

11        25.    In addition to pretexting, the investigators also took a new approach.[31] Posing as a

12   disgruntled employee, they emailed Kawamoto with the promise of revealing damaging

13   information about the company.[32] Unbeknownst to Kawamoto, the investigators utilized

14   "ReadNotify," a tracker that, once embedded into an email, allowed them to "track the path [the]

15   message takes, including whether [the] recipient opens the message."[33]

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] Robert McMillan, *HP's e-mail tracer in widespread use*, COMPUTERWORLD (Oct. 10, 2006), https://www.computerworld.com/article/2820287/hp-s-e-mail-tracer-in-widespread-use.html

1    26.    "[A] technique also employed by some e-mail marketers,"[34] the investigators hoped

2    that Kawamoto would "forward the e-mail to her source," thereby revealing who had leaked the

3    confidential information.[35]

4    27.    ReadNotify failed to yield results, with Kawamoto declining to forward the email.[36]

5    But this time around, after combing through the phone records, investigators discovered that a

6    board member, George Keyworth, had a short conversation with Kawamoto right before the article

7    was published.[37]  After the revelation, the board confronted Keyworth, who admitted to having

8    lunch with the reporter and "say[ing] some nice things about Mike Hurd."[38]

9    28.    The board responded by voting on a motion to request Keyworth's resignation.[39]

10    After the motion passed, a board member who dissented, Mark Perkins, quit in protest.[40]

11    Keyworth, for his part, refused to step aside, "saying the shareholders had elected him, and he felt

12    the punishment was out of proportion to the offense."[41]

13    29.    Perkins did not go quietly.[42]  After resigning from the board, Perkins retained a

14    lawyer, Viet Denh, who "contacted the S.E.C., the U.S. Attorney's offices in Manhattan and San

15    Francisco, the California Attorney General, the F.C.C., and the F.T.C."[43]

16    30.    Once HP's tactics were made public, the reaction was swift and overwhelming.  In

17    September 2006, Congress held a hearing on the scandal, asking Dunn and other witnesses to

---

[34] *Id.*

[35] Joris Evers, *How HP bugged e-mail*, CNET (Sept. 29, 2006),
https://www.cnet.com/news/privacy/how-hp-bugged-e-mail/.
[36] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007),
https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

answer two questions: "Exactly what did they know about the use of pretexting," and "[w]hat did they know about planting spyware on an email to a journalist."[44]

31.    The witnesses verified that investigators employed both methods to gather evidence, but they maintained that their conduct was lawful.[45]  Throughout the hearing, members of Congress called for a law that would prohibit these practices, with one member remarking that "[t]he growing market for personal information is enormous, and many of us have seen this, and that is why we need to pass legislation to stop this."[46]  When another member asked Dunn whether it "strike[s] you as a permissible tactic to use, attaching a tracking device onto an e-mail," Dunn replied, "[i]t is kind of surprising that it is legal, isn't it?"[47]  Still another member lamented that email trackers were "equivalent to going through the mail in my mailbox."[48]

32.    Six days after the hearing, the California Attorney General indicted Dunn, Hunsaker, DeLia, and two private investigators involved in both iterations of Project Kona.[49]  A few months after that, Congress passed the Telephone Records and Privacy Protection Act of 2006, a law that criminalizes "knowingly and intentionally obtain[ing], or attempt[ing] to obtain, confidential phone records information of a covered entity, by making false or fraudulent statements or representations to an employee of a covered entity." 18 U.S.C. § 1039(a)(1).  That law, as the text suggests, only prohibits pretexting, not the use of email trackers.

33.    After Congress enacted the Telephone Records and Privacy Protection Act of 2006, the Arizona legislature went a step further, passing a law that addressed *both* methods used by HP's investigators.  Like the federal law, this new Arizona law prohibits any person from procuring or conspiring with another to procure "a telephone record" of residents without consent.

---

[44] Hewlett-Packard's Pretexting Scandal: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce, 109th Cong. 45 (2006), https://www.govinfo.gov/content/pkg/CHRG-109hhrg31472/html/CHRG-109hhrg31472.htm.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] James Stewart, *The Kona Files*, THE NEW YORKER (Feb. 11, 2007), https://www.newyorker.com/magazine/2007/02/19/the-kona-files.

1   But, in addition, the new law also prohibits procurement of any "communication service record"

2   (including email records) of "any resident of this state without the authorization of the customer to

3   whom the record pertains, or by fraudulent, deceptive, or false means." Ariz. Rev. Stat. Ann. § 44-

4   1376.01. And while Congress declined to include a private right of action in the federal law, the

5   Arizona legislature allowed residents to pursue civil remedies. Ariz. Rev. Stat. Ann. § 44-

6   1376.04(2).

7        **B.**    **Email Pixels**

8        34.     Despite Arizona law prohibiting the practice, companies still embed trackers within

9   emails without first obtaining consumers' consent. Indeed, "[a] 2018 Princeton study on email

10  tracking tested over 12,000 emails from 900 senders offering mailing list subscriptions and found

11  that 70% contained trackers."[50]

12       35.     These trackers, known as "spy pixels," enable companies to learn information about

13  the email transmission, including when and where the email was opened. Pixels are used to log

14  when the recipient accesses the email and can record the number of times an email is opened, the

15  IP address linked to a user's location, and device usage.[51]

16       36.     Spy pixels can also monitor how long the recipient spends reading the email,

17  whether the email was forwarded, and whether the recipient prints the email.[52]

18       37.     The use of spy pixels is a "grotesque invasion of privacy" according to industry

19  advocates.[53]

---

[50] Mikael Berner, *The Business of Email Tracking: What To Know About Spy Pixels In Your Inbox*, FORBES (Jun 9, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/06/09/the-business-of-email-tracking-what-to-know-about-spy-pixels-in-your-inbox/?sh=2084ee793fec.

[51] Charlie Osborne, *Tracker pixels in emails are now an 'endemic' privacy concern*, ZDNET (Feb. 17, 2021), https://www.zdnet.com/article/spy-pixels-in-emails-to-track-recipient-activity-are-now-an-endemic-privacy-concern/.

[52] https://knowledge.validity.com/s/articles/Everest-Engagement-Playbook-Beginner?language=en_US

[53] *Charlie Osborne, Tracker pixels in emails are now an 'endemic' privacy concern, ZDNET (Feb. 17, 2021), https://www.zdnet.com/article/spy-pixels-in-emails-to-track-recipient-activity-are-now-an-endemic-privacy-concern/.*

38.    To activate a spy pixel, recipients only need to open the email.  The recipient does not need to directly engage with the pixel—when an email is opened the tracking pixel is automatically downloaded.[54]

39.    A spy pixel is typically a 1x1 (one pixel high by one pixel long) image.  "The spy pixel is so small it is basically impossible to see with the naked eye."[55]

40.    The spy pixel used by marketers today operates the same way as the spy pixels in the HP pretexting scandal—email activity including who accessed an email, as well as when and where an email was accessed, is procured through the same technology, an invisible pixel embedded in the email code that allows the sender to log and track that information.

**C.    Defendant's Spy Pixel Tracking**

41.    Defendant uses its own spy pixel to track when customers open their emails, as pictured in the example below.   That tracker records the email address, the subject of the email, when the email is opened and read, the recipient's location, how long the recipient spends reading an email, whether it is forwarded, whether it is printed, and what kind of email server the recipient uses, among other sensitive information:

<img src="https://click.e.williams-sonoma.com/open.aspx?█████████████ ████████████&bmt=0" width="1" height="1" alt="">

42.    Defendant embedded spy tracking pixels in marketing emails Defendant sent to Plaintiff and Class Members to collect the above-listed sensitive information, unbeknownst to email recipients.

---

[54] *Id.*

[55] Becky Willeke, *Spy pixels are hiding in your emails; so what can you do about it?*, Fox 2 Now (Mar. 15, 2021), https://fox2now.com/news/tech-talk/spy-pixels-are-hiding-in-your-emails-so-what-can-you-do-about-it/.

43.    Defendant also utilizes pixel tracking through Nexxen International Ltd. ("Nexxen"), as pictured in the example below:[56]

```
<img srchttps://d.turn.com/r/dd/id█████████████"
width1" height1" border0">
```

44.    Nexxen is a software platform that enables companies, like Defendant, to "Be more efficient with [its] targeting" by providing "data solutions for all media channels including cross-platform audiences, cookie-less identity, audience amplification and the onboarding of [a company's] own first party data."[57]

45.    Nexxen provides Defendant with a data platform that allows Nexxen to "help maximize [Defendant's] operational efficiency and minimize data leakage[.]" Thus, Defendant is sharing its user data with Nexxen so that Defendant can "achieve lower-funnel results and financial efficiency for identity solutions." *Id.*

## CLASS ACTION ALLEGATIONS

46.    Plaintiff seeks to represent a class (the "Class") defined as: All persons within Arizona who have opened a marketing email containing a tracking pixel from Defendant.

47.    Excluded from the Class is Defendant, its subsidiaries, affiliates, officers, directors, assigns and successors, and any entity in which it has a controlling interest, and the Judge to whom this case is assigned and any member of his or her immediate family.

48.    Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery.  Class members may be notified of the

---

[56] Turn Inc. ("Turn") was a company specializing in digital advertising and data management. Turn was acquired by Amobee, a global marketing technology company, which was then rebranded as Nexxen.

[57] https://nexxen.com/nexxen-data-identity-solutions/

1    pendency of this action by mail and/or publication through the distribution records of Defendant

2    and third-party retailers and vendors.

3         49.    Common questions of law and fact exist as to all Class members and predominate

4    over questions affecting only individual Class members.  Common legal and factual questions

5    include, but are not limited to:

6         a.    whether Defendant "[k]nowingly procure[d], attempt[ed] to procure,
                solicit[ed] or conspire[d] with another to procure a … communication
7               service record of any resident of this state without the authorization of the
                customer to whom the record pertains or by fraudulent, deceptive or false
8               means" in violation of A.R.S. § 44-1376 *et seq.*;

9         b.    whether Plaintiff's and the Class's "communication service records" were
10              procured, sold or received in violation of A.R.S. § 44-1376, *et seq.*

11        c.    whether Defendant's conduct violates A.R.S. § 44-1376, *et seq.* or any other
                applicable laws; and
12

13        d.    whether, as a result of Defendant's misconduct as alleged herein, Plaintiff
                and Class members are entitled to restitution, injunctive, and/or monetary
14              relief and, if so, the amount and nature of such relief.

15        50.    Plaintiff's claims are typical of the claims of Class members because Plaintiff, like

16   all Class members, had her communication service records procured, sold, or received by

17   Defendant.

18        51.    Plaintiff is an adequate representative of the Class because her interests do not

19   conflict with the interests of the Class members she seeks to represent, she has retained counsel

20   competent and experienced in prosecuting class actions, and she intends to prosecute this action

21   vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and

22   her counsel.

23        52.    The class mechanism is superior to other available means for the fair and efficient

24   adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack

25   the resources to undergo the burden and expense of individual prosecution of the complex and

26   extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases

27   the delay and expense to all parties and multiplies the burden on the judicial system presented by

28

the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

53.     Plaintiff reserves her rights under Rule of Court 3.765 to amend or modify the Class description with greater specificity, or to further divide the Class into additional subclasses.

### FIRST CLAIM FOR RELIEF
### Violation of A.R.S. § 44-1376.01

54.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

55.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

56.     Defendant embeds spy pixels in its marketing emails sent to Plaintiff and Class members.

57.     The spy pixels are designed to extract "communication service records" related to the delivery of the email in which the spy pixel is embedded.  This includes, but is not limited to, time logs of email access, logs of associated email addresses, logs of email client type, logs of email path data, logs of recipient location, logs of IP address, logs of email forwarding data, and logs of device information.

58.     Defendant "procures" Plaintiff's and Class members' "communication service records" because they "obtain by any means, including electronically" Plaintiff and Class member's "communication service records" as defined in A.R.S. § 44-1376.

59.     In contravention of A.R.S. § 44-1376.01, Defendant knowingly procures "subscriber information, including name, billing or installation address, length of service, payment method, telephone number, electronic account identification and associated screen names, toll bills or

access logs, records of the path of an electronic communication between the point of origin and the point of delivery and the nature of the communication service provided, such as … electronic mail …," which constitute "communication service records" under A.R.S. § 44-1376, from Plaintiff and Class members.

60.     Plaintiff and Class members were never informed by Defendant, and thus never knew, that Defendant would be procuring sensitive information including, but not limited to, time logs of email access, associated email addresses, email client type, email path data, IP addresses, and device information.

61.     Plaintiff and Class members never gave lawful consent to Defendant to procure the communication service records.

62.     Each time Defendant sent an email containing a spy pixel, Defendant procured a communication service record, thus committing a separate violation of A.R.S. § 44-1376.01.

63.     Defendant invaded Plaintiff's and Class members' right to privacy by its invasive surveillance of Plaintiff's and Class members' sensitive reading habits, including when they opened and read an email.  This clandestine collection of their confidential email records also intruded upon their seclusion.

64.     Accordingly, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth by the statute, including actual damages, profits made by Defendant as a result of the violation, $1,000 for each violation, reasonable attorneys' fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines to be appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A.     An Order determining that this action may proceed as a class action and certifying the proposed Class and/or any other appropriate subclasses pursuant to Code of Civil Procedure §382;

B.     An Order designating Plaintiff as the Class Representative;

C.     An Order designating Plaintiff's counsel as Class Counsel;

D.    For an order declaring that Defendant's conduct, as set out above, violates A.R.S. § 44-1376.01;

E.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

F.    For actual damages or damages of $1,000.00 for each of Defendant's violations, whichever is more, pursuant to A.R.S. § 44-1376.04, which exceeds $300,000 in aggregate;

G.    For damages equal to the sum of any profits Defendant made for each of Defendant's violations, pursuant to A.R.S. § 44-1376.04;

H.    For injunctive and other equitable relief as is necessary to protect the interests of the Class, including, inter alia, an order requiring Defendant to comply with A.R.S. § 44-1376, et seq.

I.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit;

J.    For pre- and post-judgment interest on all amounts awarded, to the extent allowable; and

K.    All such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all causes of action, claims or issues in this action that are triable as a matter of right to a jury.

Dated: August 21, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

CASE NUMBER: CGC-24-617422  KAREN SPECTOR VS. WILLIAMS-SONOMA, INC.

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **JAN 22, 2025** |
| **TIME:** | **10:30 am** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order  **without an appearance**  at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.

(SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

 **Superior Court of California, County of San Francisco**
**Information Sheet**
**Voluntary Expedited Jury Trial Summary**

The San Francisco Superior Court encocurages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;

- 8 jurors (6 must agree);

- 3 peremptory challenges per side;

- 5 hour time limit per side <u>unless agreed otherwise and approved;</u>

- One to two days court days completion <u>unless agreed otherwise and approved;</u>

- Option to present evidence by stipulation and objection;

- High/low arangement option;

- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.



# Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

## WHY CHOOSE ADR?

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint\*\***

## WHAT ARE THE ADR OPTIONS?

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

### 1) MANDATORY SETTLEMENT CONFERENCES

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

**2) MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF),** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

#### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

#### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
adrcoordinator@sftc.org
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: <br> ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER: _____ |
|---|---|
| | **DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** -- Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days ☐ 90-120 days ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

| _____ | _____ |
|---|---|
| Name of Party Stipulating | Name of Party Stipulating |
| _____ | _____ |
| Name of Party or Attorney Executing Stipulation | Name of Party or Attorney Executing Stipulation |
| _____ | _____ |
| Signature of Party or Attorney | Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐ *Additional signature(s) attached*

ADR-2  04/24          **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

EXHIBIT B

1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
   P. CRAIG CARDON, Cal Bar No. 168646
2  JAY T. RAMSEY, Cal Bar No. 273160
   BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
3  ALYSSA SONES, Cal Bar No. 318359
   PATRICK RUBALCAVA, Cal Bar No. 335940
4  1901 Avenue of the Stars, Suite 1600
   Los Angeles, California 90067-6055
5  Telephone:    310.228.3700
   Facsimile:     310.228.3701
6  Email:         ccardon@sheppardmullin.com
                  jramsey@sheppardmullin.com
7                 baigboboh@sheppardmullin.com
                  asones@sheppardmullin.com
8                 prubalcava@sheppardmullin.com

9  *Attorneys for Defendant*
   WILLIAMS-SONOMA, INC.

10

11             SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    COUNTY OF SAN FRANCISCO

13  KAREN SPECTOR, individually and on         Case No. CGC-24-617422
    behalf of all others similarly situated,
14                                             **NOTICE TO SUPERIOR COURT AND**
                    Plaintiffs,                **ADVERSE PARTY OF REMOVAL TO**
15                                             **FEDERAL COURT**
           v.
16
    WILLIAMS-SONOMA, INC.
17
                    Defendant.
18

19

20

21

22

23

24

25

26

27

28

-1-

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE**, pursuant to 28 U.S.C. § 1445(d), that on September 20, 2024, Defendant Williams-Sonoma, Inc. filed a *Notice of Removal* of this action—*Karen Spector v. Williams-Sonoma, Inc.*, Case No. CGC-24-617422—from this Court to the United States District Court for the Northern District of California.  A true and correct copy of the *Notice of Removal* is attached hereto as **Exhibit 1**.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated:  September 20, 2024         By         /s/ P. Craig Cardon
                                              P. CRAIG CARDON
                                              JAY T. RAMSEY
                                              BENJAMIN O. AIGBOBOH
                                              ALYSSA SONES
                                              PATRICK RUBALCAVA

                                              *Attorneys for Defendant*
                                              WILLIAMS-SONOMA, INC.

SMRH:4890-0704-3559.1